Norman M. ROBERTSON, John Coiro, Eugene Kulick, Garry Colletti, Jay R. Schwartz, Dennis E. Gonzalez, Gerald H. Zecker, Plaintiffs,

v.

Larry BARTELS, Richard Codey, Sonia Delgado, Thomas Giblin, Lewis Greenwald, Bonnie Watson Coleman, in their official capacities as Members of the State of New Jersey Apportionment Commission, the State Of New Jersey Apportionment Commission, Deforest B. Soaries, Jr., Secretary of State of the State of New Jersey, and John Farmer, Attorney General of the State of New Jersey, Defendants.

No. 01–2024.

United States District Court, D. New Jersey.

Decided June 18, 2001.

Norman M. Robertson, Little Falls, NJ, Pro se.

James A. Robertson, Kalison, McBride, Jackson & Murphy, P.A., Liberty Corner, NJ, for Plaintiffs John Coiro, Eugene Ku-

lick, Gary Colletti, Jay R. Schwartz, Dennis Gonzalez and Gerald H. Zecker.

Paul M. Smith, Sam Hirsch, Jenner & Block LLC, Washington, DC, Robert E. Levy, Nomi Lowy, Scarinci & Hollenbeck, Secaucus, NJ, Leon J. Sokol, Steven Siegel, Sokol, Behot & Fiorenzo, Hackensack, NJ, for Defendants New Jersey Apportionment Commission, Richard Codey, Sonia Delgado, Thomas Giblin, Lewis Greenwald, Bonnie Watson Coleman & New Jersey Apportionment Commission.

Robert L. Clifford, McElroy, Deutsch & Mahoney, Morristown, NJ, for Defendant Larry Bartels.

John J. Farmer, Jr., Attorney General, Donna Kelly, Senior Deputy Attorney General, Mark J. Fleming, Assistant Attorney General, Mark Turner Holmes, Deputy Attorney General, Pamela E. Gellert, Deputy Attorney General, Office of the Attorney General of New Jersey, Department of Law & Public Safety, Division of Law, Richard J. Hughes Justice Complex, Trenton, NJ, for Defendants Secretary of State & Attorney General of State of New Jersey.

Before MORTON I. GREENBERG, Circuit Judge, and DICKINSON R. DEBEVOISE and HAROLD A. ACKERMAN, District Judges (convened pursuant to 28 U.S.C. § 2284).

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

This matter comes on before this court on the plaintiffs' complaint seeking injunctive relief to prevent the defendants from implementing a redistricting plan for New Jersey's Senate and General Assembly districts. The plaintiffs allege that the redistricting plan violates the First, Fourteenth and Fifteenth Amendments to the United States Constitution. Additionally, they challenge the constitutionality of New Jersey's one-year district residency requirement as a requisite for an individual to be eligible to run for legislative office. The defendants have moved for summary judgment. Because we find that there is no genuine dispute as to any material fact and the defendants are entitled to judgment as a matter of law, we will grant the defendants' motion. We will refer the third count of the plaintiffs' complaint addressing the residency requirement to a single judge for disposition.

## I. BACKGROUND

This case arises out of the New Jersey Apportionment Commission's (the "Commission") certification on April 11, 2001, of a district map for the State's forty legislative districts to reflect the results of the 2000 federal decennial census. Pursuant to the Constitution of the State of New Jersey, the Senate and General Assembly districts are to be established by a Commission following every federal decennial census. See N.J. Const. Art. 4, § III, ¶ 1. The Commission is comprised of ten members, five appointed by each of the state chairpersons of the two political parties receiving the highest number of votes in the most recent gubernatorial election, here the Democratic and Republican parties. See id.

Following the Commission's appointment in November 2000, it could not agree on a redistricting plan. Therefore, pursuant to the New Jersey Constitution, Art. 4, § 3, ¶ 2, it certified its inability to do so to the Chief Justice of the Supreme Court of New Jersey, who, on or about March 26, 2001, appointed Professor Larry Bartels as the eleventh member. Thereafter, following various meetings, on April 11, 2001, the Commission certified a plan for the State's legislative districts, and on April 12, 2001, filed the plan with the Secretary of State.

The Democratic members proposed a plan that essentially was adopted, but Bartels, who plainly was the controlling party in the redistricting process, modified the plan.

That same day, immediately following the filing of the plan, certain plaintiffs who included African–American registered voters and residents of Essex County, Hispanic registered voters and residents of Essex and Hudson counties, and Republican members of the New Jersey Senate and General Assembly,[1] filed a complaint and proposed order to show cause in the district court challenging the plan. *See Page v. Bartels*, 144 F.Supp.2d 346 (D.N.J. 2001). The plaintiffs in *Page* pled four counts: (1) that the ·defendants' actions infringed upon the plaintiffs' rights as protected by § 2 of the Voting Rights Act of 1965; (2) that the plan intentionally violates § 2 of the Voting Rights Act; (3) that ratification and employment of the plan violates the plaintiffs' Due Process and Equal Protection rights as guaranteed by the Fourteenth Amendment to the United States Constitution; and (4) that defendants' actions violated the Fifteenth Amendment to the United States Constitution. The plaintiffs in *Page* sought an injunction against implementation of the new redistricting plan. Following the resolution of procedural matters not germane to this action except to the extent that the disposition has precedential significance here, *see Page v. Bartels*, 248 F.3d 175 (3d Cir.2001), Chief Judge Becker of the Court of Appeals for the Third Circuit convened a three-judge panel to preside over the matter. On April 30–May 1, 2001, the panel presided over a full evidentiary trial.

Then, on April 27, 2001, a different set of plaintiffs, namely Senator Norman Robertson, the incumbent Republican Senator in District 34, John Coiro, the Mayor of the Borough of Totowa, Eugene Kulick, the Mayor of Little Falls, Garry Colletti, the Mayor of West Paterson, and Jay Schwartz and Dennis Gonzalez, two individuals precluded from running for legislative office because of the one-year district residency requirement, commenced this action. Subsequently, Gerald H. Zecker, an incumbent Republican Assemblyman in District 34, was permitted to intervene as a plaintiff. The plaintiffs' three-count complaint alleged: first, that the proposed District 34 "was constituted with a race-based outcome as the predominant consideration to the subordination of traditional principles of redistricting" in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution; second, that the Commission engaged in purposeful unconstitutional racial discrimination by adopting a redistricting plan that favored certain minority incumbent legislators; and third, that the one-year district residency requirement of Art. IV, § I, of the New Jersey Constitution is an unconstitutional infringement upon First and Fourteenth Amendment rights. Defs.' Mot. for Summ. J. Ex. C at 6–21 (Compl.¶¶ 14–50).

On May 2, 2001, after the plaintiffs here brought this action, the *Page* panel denied the plaintiffs in that case all injunctive relief and entered final judgment in favor of the defendants. Then, on May 3, 2001, the plaintiffs in this matter filed an application for an order to show cause seeking a temporary restraining order and a preliminary injunction against implementation

---

1. The *Page* complaint described the Republican plaintiffs as "consist[ing] of citizens of the State of New Jersey who have been duly elected as Senators/Assemblymen from previously constituted legislative districts and currently serve in the New Jersey Legislature and comprise the majority of each of the respective houses." Defs.' Mot. for Summ. J. Ex. B (*Page* Compl. ¶ 18).

of the plan. Judge Debevoise, however, denied their application for the temporary restraining order, though he did schedule a hearing on the plaintiffs' application for a preliminary injunction for May 15, 2001. Thereafter, on May 7, 2001, Chief Judge Becker appointed a three-judge panel to preside over this matter pursuant to 28 U.S.C. § 2284.[2]

Subsequently, the parties in this case agreed to consolidate the preliminary and permanent injunction hearings. They also agreed, and we ordered, that testimony taken in the *Page* litigation would be admissible at trial in this action and available for incorporation in the defendants' summary judgment motion. *See* Defs.' Mot. for Summ. J. Ex. J at 12 (Tr. of May 16, 2001 Conference).

We heard oral argument on defendants' summary judgment motion on May 31, 2001, following which we orally granted the motion on the first and second counts of the complaint dealing with the redistricting issues. We reserved judgment on the third count pending further briefing by the parties on whether we should refer it to a single judge for disposition. We since have concluded that we should refer that count to a single judge and have entered an order doing so. This opinion sets forth our reasons for taking these actions.

## II. JURISDICTION

We have jurisdiction pursuant to 28 U.S.C. § 1331, as the plaintiffs filed suit raising claims under the United States Constitution. Because the plaintiffs' claims challenge the constitutionality of the apportionment of a statewide legislative body, pursuant to 28 U.S.C. § 2284, counts one and two are properly heard before a district court of three judges.

## III. DISCUSSION

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In resolving a motion for summary judgment, we are required to determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In making this determination, the evidence of the plaintiffs as the nonmoving parties is to be believed and we must draw all reasonable inferences in their favor. *See id.* at 255, 106 S.Ct. at 2513. Furthermore, the defendants, as the movants, bear the initial burden of informing us of the basis for their motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the defendants meet their initial burden, the plaintiffs may not rest upon their pleadings, but must set forth specific facts showing there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

---

**2.** Section 2284(a) provides, in relevant part: "A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." 28 U.S.C.

§ 2284(a). The panel originally was comprised of Leonard I. Garth, Circuit Judge, and Dickinson R. Debevoise and Harold A. Ackerman, District Judges, the same panel as in *Page*. Circuit Judge Morton I. Greenberg subsequently was substituted for Judge Garth.

In support of their motion for summary judgment as to counts one and two, the defendants raise two meritorious arguments: first, that the doctrine of *res judicata* bars the plaintiffs' claims, and second, that the plaintiffs failed to substantiate their claims factually.

## A. Res Judicata

The defendants contend that the plaintiffs are barred by the doctrine of *res judicata* from bringing this case. They argue that although the plaintiffs pursue legal theories different from those in *Page,* the claims involve the same basic underlying facts, seek the same basic relief, and are brought by parties sufficiently related to the *Page* plaintiffs so that they should be treated as the same under the doctrine of virtual representation. In essence, defendants claim that because the matter has been litigated once, the plaintiffs are precluded from doing so again.

■■■ *Res judicata* or claim preclusion operates to prevent a party from raising or defending against a claim that already has been decided. As the Supreme Court recognized in *Nevada v. United States,* 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983):

> [T]he doctrine of *res judicata* provides that when a final judgment has been entered on the merits of a case, '[i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered

for that purpose'.... The final 'judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever.'

*Id.* at 129–30, 103 S.Ct. at 2918 (quoting *Cromwell v. County of Sac,* 94 U.S. 351, 352, 4 Otto 351, 24 L.Ed. 195 (1876), and *Commissioner v. Sunnen,* 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948)). *Res judicata* requires a showing that there has been "(1) a final judgment on the merits of a prior suit involving (2) the same claim and (3) the same parties or their privities." *EEOC v. United States Steel Corp.,* 921 F.2d 489, 493 (3d Cir. 1990); *see Board of Trustees of Trucking Employees Welfare Fund, Inc. v. Centra,* 983 F.2d 495, 504 (3d Cir.1992). If these three factors are present, the court must dismiss a claim that was or could have been raised previously as precluded. *See CoreStates Bank v. Huls Am., Inc.,* 176 F.3d 187, 194 (3d Cir.1999). Inasmuch as the panel in *Page* has entered a final judgment on the merits of that case, the issue is whether this matter involves the same claim by the same parties.[3]

■■■ Turning first to whether this matter involves the same claim as *Page,* we note that "[i]n deciding whether two suits are based on the same 'cause of action,' we take a broad view, looking to whether there is an 'essential similarity of the underlying events giving rise to the various legal claims.'" *Id.* (quoting *United States v. Athlone Indus.,* 746 F.2d 977, 984 (3d Cir.1984)). To that end, causes of action are deemed the same if they arise from the same transaction, with the scope

---

**3.** The plaintiffs in *Page* have filed an appeal. That circumstance is not germane to our *res judicata* analysis as the *Page* judgment has preclusive effect unless disturbed on the appeal. *See* Restatement (Second) of Judgments 2d § 13 cmts. b & f (stating that for *res*

*judicata* purposes, judgment is "final" even if pending on appeal); *id.* § 16 cmts. a-c; *see also Huron Holding Corp. v. Lincoln Mine Operating Co.,* 312 U.S. 183, 189, 61 S.Ct. 513, 515, 85 L.Ed. 725 (1941).

of the transaction being determined by considering whether there exists a common nucleus of operative facts. *See* Restatement (Second) of Judgments § 24 cmt. b (1982); *Nevada,* 463 U.S. at 130 n. 12, 103 S.Ct. at 2918 n. 12; *CoreStates,* 176 F.3d at 194.

In considering whether this case and *Page* involve the same claim, we initially note that the plaintiffs' claims in both cases arise, ultimately, from the same event: approval by the Commission of the new legislative redistricting plan. Further, both complaints center on one specific area of the plan, namely the "unpacking" of Essex County, specifically the former District 27, by moving a substantial portion of the African–American population of that district into a new District 34. Finally, both sets of plaintiffs seek the restoration of voting districts resembling the former District 27 and District 34. Even though the *Page* plaintiffs challenged the redistricting plan on the grounds that it unconstitutionally diluted the African–American and Hispanic populations' vote, while the current plaintiffs argue essentially the opposite, that is, that the plan constitutes impermissible racial gerrymandering, the difference is of no consequence. This is so because our inquiry focuses not on the specific arguments the plaintiffs set forth in each case, but on the facts and occurrences that underlie and support the plaintiffs' requests for relief. As both causes of action rely upon the same facts and circumstances, we conclude that the final judgment in *Page* was entered on the merits in a prior suit involving the same claim as that here.

We therefore turn to the question of whether that final judgment was entered against the same parties or persons in privity with the parties that have brought this case. The term privity "is merely a word used to say that the relationship between one who is a party on the record and another is close enough to include the other within *res judicata.*" *United States Steel Corp.,* 921 F.2d at 493 (internal quotation marks omitted); *see First Options of Chicago v. Kaplan,* 913 F.Supp. 377, 383 (E.D.Pa.1996) (internal quotation marks omitted) (noting "[p]rivity is a legal determination for the trial court as to whether the relationship between the parties is sufficiently close to support preclusion"). Courts typically have found that there is privity in three circumstances: (1) where the nonparty has succeeded to, or shares a concurrent right to, the party's interest in, property; (2) where the nonparty controlled the prior litigation; and (3) where the party adequately represented the nonparties' interests in the prior proceeding. *See, e.g., Latham v. Wells Fargo Bank, N.A.,* 896 F.2d 979, 983 (5th Cir.1990).

At issue here is the third category of privity, also known as the doctrine of virtual representation. While the Court of Appeals for the Third Circuit has addressed the doctrine of virtual or adequate representation applying state issue preclusion principles in a diversity case, *Collins v. E.I. DuPont de Nemours & Co.,* 34 F.3d 172, 176 (3d Cir.1994), as far as we are aware it has yet to set forth the circumstances in which it will find that there has been virtual representation where there has been a previous judgment in an earlier action regarding issues of federal law. In *Moldovan v. Great Atlantic & Pacific Tea Co.,* 790 F.2d 894, 898–99 (3d Cir.1986), however, the court set forth general principles of the doctrine. First, the court noted that while "mutuality of estoppel by judgment is no longer considered to be a due process requirement, the development of nonmutual collateral estoppel made no change in the requirement that a party against whom collateral estoppel has been

asserted have some fair relationship with the prior litigation relied upon."[4]  *Id.* at 899. Therefore, any privity analysis must center on a finding of identity of interests between the parties in the first and second cases. *See id.* (emphasis in original) ("It is the identity of *interests* that determines the due process question, not . . . the identity of *issues.*").

Other courts to address virtual representation have recognized several guiding principles in determining the applicability of the doctrine. First, identity of interests between the two parties is necessary, although alone it is not sufficient. *See Mann v. City of Albany*, 883 F.2d 999, 1003 (11th Cir.1989). Further, courts should consider whether: there is a close relationship between the prior and present parties; the present party participated in the prior litigation; the present party apparently acquiesced; and the present party deliberately maneuvered to avoid the effects of the first action. *See Tyus v. Schoemehl*, 93 F.3d 449, 455 (8th Cir.1996) (citing *Petit v. City of Chicago*, 766 F.Supp. 607, 612 (N.D.Ill.1991), and 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure: Jurisdiction* § 4457 (1981)). Additionally, courts should consider the adequacy of the prior representation, where adequacy is viewed in terms of incentive to litigate. *See id.; Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 762 (1st Cir.1994). As the *Tyus* court recognized,

"one party 'adequately represents' the interests of another when the interests of the two parties are very closely aligned and the first party had a strong incentive to protect the interests of the second party."[5]  *Tyus*, 93 F.3d at 455–56.

Finally, courts should consider whether a public or private law issue is raised. *See id.* at 456. Where the case raises a public law issue with only an indirect effect on a party's interests, the Supreme Court has recognized that due process concerns are lessened giving courts "wide latitude to establish procedures . . . to limit the number of judicial proceedings. . . ." *Richards v. Jefferson County*, 517 U.S. 793, 803, 116 S.Ct. 1761, 1768, 135 L.Ed.2d 76 (1996). Additionally, because of the potentially large number of plaintiffs with standing in public law cases, were they allowed to raise issues continually, public law claims "would assume immortality." *Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist.*, 750 F.2d 731, 741 (9th Cir.1984). Moreover, inasmuch as a plaintiff's success in a public law case may benefit a broad group of persons, claim preclusion predicated on an initial judgment may be appropriate because it deters interested individuals from "fence-sitting," namely waiting for the outcome of the prior action. *See Tyus*, 93 F.3d at 456. Thus, unless an action is deemed precluded by an earlier judgment, "nonparties would benefit if the plaintiffs were successful but would not be penalized if the plaintiffs lost." *Id.*

---

4. *Moldovan* involved collateral estoppel, but its privity analysis is equally applicable here as the concept is common to both preclusion doctrines, collateral estoppel (issue preclusion) and *res judicata* (claim preclusion).

5. In so finding, the *Tyus* court dismissed the argument that the adequacy of representation refers not to the incentive to litigate, but rather to trial strategy and possible trial errors. *See Tyus*, 93 F.3d at 455 n. 7. It found that the essence of a virtual representation analysis is

the alignment of the parties' interests, therefore "[w]hile incentive to litigate may have some bearing on whether the two parties' interests are aligned, considerations of trial strategy and possible trial errors . . . have little bearing on the relationship between the parties [making them] external to this inquiry." *Id.* Additionally, the court noted that commonly in civil litigation, clients are held responsible for the acts of their attorney. *See id.*

Applying these principles, we find that *res judicata* based on virtual representation precludes the plaintiffs' claims. To this end, *Tyus* provides not only a useful virtual representation analysis, but also a factual background remarkably similar to that here. In *Tyus* a group of St. Louis African–American aldermen had challenged the validity of new ward boundaries drawn as a result of the 1990 census. *See id.* at 451. The plaintiffs in that action contended that the boundary lines diluted black voting strength in violation of the Voting Rights Act and the First, Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution. *See id.* At a time when a motion for summary judgment was pending in that suit, several of the same aldermen, along with three other individuals, filed a second lawsuit raising the same legal theories as in the then-pending action. *See id.* Thereafter, the court granted summary judgment in the first case, *see id.* at 452, leading the defendants in the second action to move to dismiss the complaint on preclusion grounds. The district court granted the motion, and the court of appeals affirmed.

In applying the virtual representation doctrine, the *Tyus* court looked first to the relationship between the prior and present parties. The court found it to be close based on the similarity of their claims, and the partial overlap in parties and attorneys. Further, the court deemed it significant that all of the parties shared the same concern, namely the dilution of the African–American vote in St. Louis, and found that it indicated a particular commonality of interests. *See id.* at 457. Next, the *Tyus* court examined the tactical maneuvering that took place, finding that the second plaintiffs' attempt to circumvent trial strategy disagreements flew di-

rectly in the face of the policies supporting preclusion. *See id.* Finally, the court relied upon the fact that the case raised issues of public law, thereby lessening the due process concerns associated with preclusion. *See id.* Ultimately, given that the factors counseled in favor of preclusion, the court of appeals concluded the first plaintiffs adequately represented the interests of the second plaintiffs and that the two were therefore in privity. *See id.* at 458.

The facts in this case are strikingly similar to those in *Tyus*. First, although not as strong, there is an identity of parties between the prior and present plaintiffs. The *Page* plaintiffs included, among others, Republican members of the New Jersey Senate and General Assembly. *See Page,* 144 F.Supp.2d at 349 n. 3. Here, plaintiff Robertson is a Republican member of the New Jersey Senate. Therefore, although he did not directly participate in the *Page* litigation, by association he was a party to it. While it is true that the other plaintiffs here were not parties in *Page,* the situation in *Tyus* was somewhat similar as there were three plaintiffs in the second case there that had not been parties in the first case. Moreover, there is a clear commonality of interests among all of the parties: their challenge to the validity of the New Jersey redistricting plan. This much is obvious in that a victory by the *Page* plaintiffs would have directly benefitted the *Robertson* plaintiffs.

Second, viewing the timing and joinder of additional parties, we find that the *Robertson* plaintiffs engaged in tactical maneuvering.[6] Like the plaintiffs in *Tyus*, who brought their action while the underlying case was pending, the *Robertson* plaintiffs elected to file a new complaint prior to the

---

**6.** We do not imply that their litigation tactics     were in any way improper.

disposition of *Page,* rather than intervening and arguing their position in the alternative as *Page* plaintiffs. Further, Robertson added new plaintiffs to the second cause of action. As the *Tyus* court noted, to allow the second lawsuit under these circumstances would "directly contravene[ ] the policies supporting the preclusion doctrines." *Tyus,* 93 F.3d at 457. Rather than creating an incentive to intervene:

> [H]olding preclusion inapplicable assures that a party would not intervene, for it would allow various members of a coordinated group to bring separate lawsuits in the hope that one member of the group would eventually be successful, benefitting the entire group. This entails a significant cost to the judicial system and 'discourage[s] the principles and policies the doctrine of *res judicata* was designed to promote.'

*Id.* (quoting *Petit,* 766 F.Supp. at 613).

Third, the *Robertson* plaintiffs clearly received adequate representation in *Page.* As noted previously, the *Page* plaintiffs had every incentive and opportunity to litigate the validity of New Jersey's redistricting plan fully and experienced competent counsel represented them in that endeavor. While it is true that this case differs from *Tyus* in that the present plaintiffs raise different, indeed opposite, claims from those made in the first, *i.e., Page* litigation, the difference is immateri-al. The *Page* plaintiffs sought, and the present plaintiffs seek, a declaration that the redistricting plan is unlawful and relief precluding its implementation. Whether the court invalidated the redistricting plan because it unlawfully diluted the voting strength of African–American voters or because it constituted racial gerrymandering does not matter; the result desired by the plaintiffs in each action would have been accomplished. Therefore, the plaintiffs' different claims amount to nothing more than differences in strategy, clearly an inappropriate basis upon which to allow a second lawsuit.

Fourth and finally, this case raises an issue of public law. The *Robertson* plaintiffs allege that the redistricting plan constitutes racial gerrymandering; they do not claim they "have a different private right not shared in common with the public." *Id.* (internal quotations omitted).[7] Therefore, there is a genuine concern that the issue of whether the redistricting plan is valid could "assume immortality." *Los Angeles Branch NAACP,* 750 F.2d at 741.[8]

Considering all of these factors, and the Court of Appeals for the Third Circuit's broad approach to privity, *see Collins,* 34 F.3d at 176, we find that while this case is close, the *Page* plaintiffs adequately represented the interests of the *Robertson* plaintiffs, and therefore the two sets of plaintiffs are in privity.[9] Accordingly, be-

---

7. We recognize that Robertson and Zecker are incumbent legislators but the terms for which they were elected are not impaired by the redistricting which obviously has only a prospective effect. While we are not oblivious to the circumstances that incumbents frequently are reelected, still, from a legal point of view, they have no more claim of right to seats in the next legislature from District 34 than any person eligible to run in that district.

8. We realize that as a practical matter once the new redistricting plan is implemented and an election is held under it, there is not likely to be a further judicial challenge to the plan and thus the use of the term "immortality" is an overstatement here. Nevertheless, *Los Angeles Branch NAACP* sets forth a concept useful here.

9. This conclusion does not apply, however, to the plaintiffs' challenge to the constitutionality of New Jersey's one-year residency requirement as there was no commonality of interests between the two sets of plaintiffs as to

cause there has been a final judgment on the merits in *Page* in which the plaintiffs challenged the same transaction and the plaintiffs here are in privity with those in *Page*, we must dismiss any claim that was or could have been raised previously in *Page*. On this basis we grant the defendants a summary judgment on the first two counts of the complaint.

Notwithstanding our conclusion of this *res judicata* point, because this case is close and because of the importance of this matter both to the parties and general public, we nevertheless address the merits of the plaintiffs' gerrymandering and discrimination claims.

### B. *Racial Gerrymandering Claim*

The Supreme Court set forth the principles governing a claim of racial gerrymandering in *Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), and recently reaffirmed them in *Hunt v. Cromartie*, 532 U.S. 234, 121 S.Ct. 1452, 1458, 149 L.Ed.2d 430 (2001). In *Shaw*, the Court held that "a plaintiff challenging a reapportionment statute under the Equal Protection Clause may state a claim by alleging that the legislation, though race neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." *Shaw*, 509 U.S. at 649, 113 S.Ct. at 2828. In *Hunt*, the Court reiterated its previously stated position that the plaintiff "must show at a minimum that the 'legislature subordinated traditional race-neutral districting principles ... to racial considerations.'" *Hunt*, 121 S.Ct. at 1458 (quoting *Miller v. Johnson*, 515 U.S. 900, 916, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995)). Indeed, the plaintiffs must establish that race was not simply "*a* motivation for the

drawing of a majority-minority district," *Bush v. Vera*, 517 U.S. 952, 959, 116 S.Ct. 1941, 1952, 135 L.Ed.2d 248 (1996), but "the '*predominant* factor' motivating the legislature's districting decision." *Hunt*, 121 S.Ct. at 1458 (quoting *Hunt v. Cromartie*, 526 U.S. 541, 547, 119 S.Ct. 1545, 1549, 143 L.Ed.2d 731 (1999), and *Miller*, 515 U.S. at 916, 115 S.Ct. at 2488). Put another way, the plaintiffs bear the burden of establishing that a facially neutral law "is unexplainable on grounds other than race." *Id.* (internal quotations omitted). Of course, the burden on plaintiffs to make this showing is a "demanding one." *Miller*, 515 U.S. at 928, 115 S.Ct. at 2497 (O'Conner, J. concurring).

Therefore, under *Shaw* a plaintiff may challenge a reapportionment statute successfully by showing that a redistricting plan on its face is so dramatically irregular that it only can be explained as an attempt to segregate persons by race for purposes of voting without regard for traditional redistricting principles. *See Shaw*, 509 U.S. at 649, 113 S.Ct. at 2828. The Court expressly declined to decide, however, under what circumstances a redistricting plan that, on its face, can be explained in nonracial terms, successfully could be challenged. *See id.*

One year after *Shaw*, a three-judge panel in *DeWitt v. Wilson*, 856 F.Supp. 1409, 1413 (E.D.Cal.1994), *aff'd*, 515 U.S. 1170, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995), addressed that issue. In *DeWitt*, the plaintiffs brought a *Shaw*-type challenge to California's 1992 redistricting plan, alleging the map drawers' consideration of race pursuant to the Voting Rights Act constituted an unconstitutional racial gerrymander. *See id.* at 1410–12. The district court granted the defendants' motion for summary judgment, finding that the redis-

this claim. Moreover, *Page* was not directly concerned with residency requirements.

tricting plan did not involve racial gerrymandering and therefore did not violate the Fourteenth and Fifteenth Amendments, *see* 856 F.Supp. at 1410, and the Supreme Court summarily affirmed. *See DeWitt*, 515 U.S. 1170, 115 S.Ct. 2637.

In so holding, the district court considered the "narrow holding" of *Shaw*, finding a plaintiff only states a claim where the redistricting "rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." *Id.* at 1413. It concluded that the California redistricting plan did not fit within this narrow holding. *See id.* Specifically, the court found that the masters charged with redrawing the district map "sought to balance the many traditional redistricting principles, including the requirements of the Voting Rights Act." *Id.* Further, the redistricting plan did not create bizarre boundaries. *See id.* To the contrary, the court found the redistricting plan emphasized "geographical compactness which takes into account the presence or absence of a sense of community made possible by open lines of access and communication." *Id.* (internal quotations omitted). There was also evidence that the masters analyzed and reconciled the traditional districting requirements of population equality, contiguity, geographic integrity, community of interest and the retention of existing political boundaries. *See id.* at 1414.

In this context, "where race is considered only in applying traditional redistricting principles along with the requirements of the Voting Rights Act," the court concluded strict scrutiny of the plan was not required even though, as *Bush* made clear, a redistricting scheme will be subject to strict scrutiny if race is the predominant factor in drawing the district lines. *See Bush*, 517 U.S. at 959, 116 S.Ct. at 1951–52; *Page v. Bartels*, 248 F.3d at 192; *DeWitt*, 856 F.Supp. at 1415. Indeed, *Shaw* recognized that consciousness of race does not give rise to a claim of racial gerrymandering when race is considered along with traditional redistricting principles, such as compactness, contiguity and political boundaries. *See Shaw*, 509 U.S. at 646, 113 S.Ct. at 2826. The Supreme Court since has affirmed this conclusion expressly. *See Bush*, 517 U.S. at 958, 116 S.Ct. at 1951 (noting strict scrutiny does not apply merely because redistricting is performed with consciousness of race and citing *DeWitt* for proposition that strict scrutiny does not "apply to all cases of intentional creation of majority-minority districts").

Here, the plaintiffs contend the Commission engaged in unlawful gerrymandering in drawing the redistricting plan generally, and in redrawing District 34, Senator Robertson's and Assemblyman Zecker's district, specifically. In support of their claim, they rely upon statements made by Bartels, in his certification and at trial in the *Page* case, as well as what they characterize as "the senseless nature of the combination of towns" in District 34. Pls.' Br. in Supp. of Order to Show Cause at 17. But after analyzing the principles *Shaw* and *DeWitt* set forth and which the Court has affirmed in *Hunt*, we are satisfied that the plaintiffs have failed to support a claim for racial gerrymandering subject to strict scrutiny.[10]

---

10. In their brief opposing the defendants' motion for summary judgment, the plaintiffs cite *King v. State Board of Elections*, 979 F.Supp. 619 (N.D.Ill.1997), presumably to support their position that strict scrutiny applies to the redistricting plan in this case, and that under that standard, the Commission has failed to show a compelling state interest. The *King* case, however, was on remand from a determination by the Supreme Court that

First, the record reveals that rather than drawing district lines solely on the basis of race, the Commission considered traditional redistricting principles as well as the requirements of the Voting Rights Act. The plaintiffs point to two paragraphs in Bartels' certification to support their argument that race was the predominant factor in the Commission's adoption of the redistricting plan. In paragraph 6, Bartels stated that, due to his understanding of the Voting Rights Act, "in the process of evaluating competing redistricting maps, I paid close attention to racial and ethnic data and electoral opportunities." Defs.' Mot. for Summ. J. Ex. D (Bartels Cert. ¶ 6). In paragraph 12 Bartels stated, "I was ... determined not to adopt any plan that would significantly threaten the re-election chances of incumbent minority legislators, and furthermore, I was determined to examine possibilities for expanding minority representation." Id. ¶ 12. He continued by stating, "I was (and am) convinced that every minority incumbent who seeks reelection in 2001 under [the plan adopted] has a strong opportunity to be reelected. Moreover, I believe that [the plan] is superior to GOP-H20 (or any other plan proposed by the Republicans) in terms of creating new opportunities for minority candidates to win seats in the Legislature." Id. The plaintiffs point to these statements as evidence that Bartels and the Commission made race the "predominant factor in the odd configuration of the new 34th District." Pls.' Br. in Supp. of Order to Show Cause at 12.

The plaintiffs, however, take these comments out of the larger context of Bartels' full certification and trial testimony. In

his certification, Bartels first summarized his approach to evaluating and selecting a redistricting plan. He stated:

6. Based on Justice Clifford's [11] advice, I understood that federal law prohibited any redistricting plan that gave minority voters less opportunity than non-minority voters to elect their preferred candidates to the New Jersey Legislature. Therefore, in the process of evaluating competing redistricting maps, I paid close attention to racial and ethnic data and electoral opportunities.

7. However, those were not my sole considerations. I also paid close attention to several other criteria, including (1) minimizing the population deviations among the districts, as required by the 'one person, one vote' rule; (2) keeping each of the forty districts contiguous; (3) keeping each of the forty districts reasonably compact; (4) respecting municipal boundaries by not splitting any towns other than Newark and Jersey City (which are too large to fit in one legislative district); (5) respecting voting-district boundaries; (6) avoiding any bias in the map that might favor one political party over the other in an election year when the two parties were tightly competitive; (7) ensuring that some seats were competitive so that the composition of the Legislature would be responsive to shifts in votes from one party to the other; and (8) minimizing voter disruption, so as not to deny too many New Jersey citizens the opportunity to vote for incumbents who had served them well or against incumbents who had not done so.

the plaintiffs had stated a racial gerrymander claim, and therefore deals exclusively with the application of the strict scrutiny test. Because we conclude strict scrutiny is inapplicable to this redistricting plan, the plaintiffs' reliance on King is misplaced.

**11.** The reference to Justice Clifford was to Robert L. Clifford, a retired New Jersey Supreme Court justice who was advising Bartels as a private attorney, not as a Supreme Court justice.

Defs.' Mot. for Summ. J. Ex. D (Bartels Cert. ¶¶ 6–7). He then went on to examine and elaborate on these criteria. Regarding equal population, he stated:

Because New Jersey's resident population, according to the 2000 census, was 8,414,350, the ideal population for each of the forty districts was approximately 210,359. For each map I considered, I determined the average ... deviation ... and the maximum deviation.... The average deviation in [the plan ultimately adopted] is 4,481 and the maximum deviation is 16,495. For the Republicans' plan ..., the average deviation was 5,062 (approximately 13 percent larger than in [the adopted plan] ) and the total deviation was 17,879 (approximately 8 percent larger than in [the adopted plan]).

*Id.* ¶ 11. On contiguity, Bartels certified:

I insisted that all 40 districts be contiguous—that is, that no district be divided into two or more discrete pieces. Contiguity allows candidates and representatives to get from one part of the district to another efficiently, without traversing other districts. At one point, I insisted on putting the town of Pine Beach in District 9 rather than District 10 to avoid a potential problem of contiguity stemming from some legal uncertainty regarding municipal jurisdiction over a portion of the Toms River. In [the plan selected], all 40 districts are contiguous.

*Id.* ¶ 13. Similarly, Bartels elaborated on his consideration of compactness by stating:

From the political science literature, I am aware that there are many competing measures of compactness, some of which may conflict with others. The fact that all of the proposed plans maintained the integrity of voting districts and (with the necessary exceptions of Newark and Jersey City) municipalities

helped to ensure a reasonable level of compactness. However, even with those constraints it would be possible to create rather bizarrely shaped districts. I discouraged both sides from proposing such districts, and in some cases suggested specific changes intended to improve compactness. I believe that the plan adopted by the Commission ... contains 40 reasonably compact districts.

*Id.* ¶ 14. Finally, Bartels specified with regard to respecting municipal and voting-district boundaries that "[a]ll of the proposed plans kept every municipality in the State of New Jersey intact within one district, with the necessary exceptions of Newark and Jersey City," and "[a]ll of the proposed plans kept every voting district intact within one legislative district." *Id.* ¶¶ 15–16.

Bartels also testified as to his reliance upon these criteria during the *Page* trial. When asked to describe for the court the criteria he applied, he stated:

Some of the criteria were clear legal criteria having to do, for example, with the maximum allowable population deviation across districts, with issues of contiguity and compactness, with requirements about maintaining intact within a single district municipalities, except in cases where that was impossible to do because of the numbers. The various criteria with respect to minority representation in the Voting Rights Act—all of those were legal hurdles that any plan would have to overcome, that were also a variety of criteria that seemed to me to be important in addition to those. Some of them had to [do] with refinements of the same criteria. For example, in situations where the population deviations were within what courts had typically allowed, it still seemed to me to be advisable to have the deviation and population across districts be as small as

possible. There were criteria with respect to the partisan ... bias of a particular plan. With respect to the responsiveness of the district to changes in voting patterns over the course of the coming decade, and an attempt to minimize voter disruption by insuring that as many people as possible would have the opportunity to vote for or against their current incumbents.

Ex. G (*Page* Trial Tr. at 349–50). Bartels also testified as to precisely why he selected the Democrats' plan over that of the Republicans, stating he found the Republicans' plan to be "inferior" with respect to partisan bias and voter disruption. *Id.* at 375–78.

In sum, Bartels' certification and trial testimony in *Page* clearly establish that while race was a consideration in selecting a redistricting plan, it was not the predominant factor. Bartels acknowledges that he considered the racial composition of the new districts, including the electoral opportunities for minority candidates. But he considered many factors other than race. As the Court in *Shaw* recognized, mere consciousness of race in redistricting is an insufficient basis on which to trigger strict scrutiny where it is considered along with traditional redistricting principles, such as compactness, contiguity and political boundaries. *See Shaw*, 509 U.S. at 646, 113 S.Ct. at 2826. Here, there is clear evidence, not refuted by actual facts, that

in addition to racial criteria, Bartels considered traditional redistricting principles including equal population, contiguity, compactness, respect for municipal and voting-district boundaries, the avoidance of partisan bias, competitive and responsiveness, and the minimization of voter disruption.[12]

Further, notwithstanding the plaintiffs' argument that the districting plan resulted in the "senseless" combination of towns, the boundaries of the redistricting plan generally, and District 34 specifically, are hardly irregular or bizarre. As to compactness and municipal boundaries, Bartels' certification states that the Commission's plan "contains 40 reasonably compact districts" and "[a]ll of the proposed plans kept every municipality in the State of New Jersey intact within one district, with the necessary exceptions of Newark and Jersey City." Defs.' Mot. for Summ. J. Ex. D (Bartels Cert. ¶¶ 14–15).

The plaintiffs nevertheless argue that District 34 is shaped irregularly because three contiguous municipalities, Totowa, West Paterson and Little Falls, that enjoy similar history, demographics, media and institutions, are in three different legislative districts.[13] At the same time, East Orange no longer shares a district with demographically-similar Orange, West Orange and South Orange, but rather is part of a district including towns of a

---

**12.** Indeed, the plaintiffs come close to conceding as much in their brief in support of their order to show cause in which they state that "[a]lthough the plan adopted did not appear to violate the New Jersey constitutional requirements of contiguity, compactness and respect for municipal boundaries, everything else took a back seat to race as a consideration." Pls.' Br. in Supp. of Order to Show Cause at 14. The plaintiffs then proceed to cite instances from Bartels' certification where he discusses such traditional redistricting criteria as equal population, avoiding par-

tisan bias, competitiveness and responsiveness, and minimizing voter disruption. *See id.*

**13.** It is worth noting, however, that these three municipalities were not in the same district under the previous redistricting plan. To the contrary, Totowa and Little Falls were in District 34, while West Paterson was in District 35. *See* Defs. Mot. for Summ. J. Ex F (Manual of the Legislature of New Jersey, at 950–52).

different racial, demographic, social and economic composition.

The plaintiffs argue, in essence, that race was the predominant reason for the inclusion of predominantly African–American East Orange into the heretofore predominantly white District 34. But, as noted previously, while Bartels expressly considered race in selecting a redistricting map, specifically the opportunities for minorities to be elected to office, he also relied upon traditional redistricting principles. Bartels considered and adhered with respect to District 34 to principles of contiguity, compactness, respect for municipal boundaries and partisan fairness and responsiveness. Therefore, we find the redistricting plan is not of such a bizarre or irregular shape that it is unexplainable on grounds other than race.

Finally, the plaintiffs challenge the plan on the theory that, rather than "packing" African–American voters into majority-minority districts, it attempts to integrate several legislative districts, principally District 34. Therefore, while race was still a factor in drawing the redistricting plan, the import of the considerations underlying the Court's decisions in *Shaw* and *Hunt* is diminished. As the *Shaw* Court found:

> [R]eapportionment is one area in which appearances do matter. A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid. It reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls. We have rejected such perceptions elsewhere as impermissible racial stereotypes.

.　　.　　.　　.　　.

> [Further,] [t]he message that such districting sends to elected representatives is equally pernicious. When a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole. This is altogether antithetical to our system of representative democracy.

*Shaw*, 509 U.S. at 647–48, 113 S.Ct. at 2827. These concerns, while unquestionably legitimate, do not come into play under the Commission's plan. Indeed, the redistricting plan goes farther than traditional majority-minority redistricting plans in fighting these concerns by purposefully retaining geographically contiguous and compact boundaries at the expense of a majority-minority racial composition.

Therefore, we find that the record demonstrates that a trier of fact would be constrained to conclude that the redistricting plan carefully was drawn utilizing traditional redistricting principles while seeking to comply with the Voting Rights Act by giving minority candidates the opportunity to be elected to political office. While the Commission certainly considered race in selecting the plan, its use was permissible and was not the predominant factor in the adoption of the redistricting plan. Accordingly, the plaintiffs have failed to substantiate a claim of racial gerrymandering in violation of the Equal Protection Clause or the Fifteenth Amendment and the defendants' motion for summary judgment is granted as to Count I.

## C. *Disparate Treatment Claim*

■ Count II of the plaintiffs' complaint alleges that the redistricting plan unconstitutionally separates incumbents by their race and subjects them to disparate treatment on that basis. Although not expressly stated as such, this argument presents a variation on their first argument, namely that race—of incumbents, rather than voters—was the predominant factor in the Commission's decision to adopt the redistricting plan. Because we find that race, while considered, was not the predominant factor in the Commission's redistricting plan, we also grant the defendants' motion as to Count II.

In support of their position, the plaintiffs again point to statements in Bartels' certification that he considered the reelection prospects of minority incumbent legislators in evaluating the plans. *See* Defs.' Mot. for Summ. J. Ex. D (Bartels Cert. ¶¶ 6, 12, 22). But, as previously discussed, Bartels considered much more than simply the reelection chances of minority incumbents in assessing the redistricting plans. Indeed, Bartels expressly stated that he considered "minimizing voter disruption, so as not to deny too many New Jersey citizens the opportunity to vote for incumbents who had served them well or against incumbents who had not done so." *Id.* ¶ 7. Bartels conceded that this goal conflicted to a certain degree with "the goals of creating a fair, unbiased, and responsive map and building new opportunities for minority representation," but that the plan was a good compromise. *Id.* ¶ 21. Furthermore, Bartels sought to achieve statewide partisan fairness so that the party that receives a majority of the total statewide vote in a legislative election will obtain a majority in the legislature. *See id.* ¶¶ 17–18.

It was central to achieving Bartels' goals in the redistricting to "unpack" the primarily African–American districts in Essex County, a process which necessarily made the surrounding districts, including District 34, more racially integrated. Of course, one consequence of the unpacking was that the chances for the reelection of the incumbents in those previously predominantly white districts was lessened, but this circumstance does not mean that the race of the incumbent was the predominant factor of the Commission's consideration. In redistricting, the Voting Rights Act makes race a relevant factor to be considered, and strict scrutiny is not triggered necessarily where it is utilized. To the contrary, the Voting Rights Act expressly directs redistricters and courts to consider "[t]he extent to which members of a protected class have been elected to office" when analyzing the "totality of circumstances" confronting minority voters and, as we have indicated, the Supreme Court has found race to be a constitutionally appropriate factor, so long as it is not the predominant factor. 42 U.S.C. § 1973(b). It is therefore apparent that while Bartels and the Commission considered the race of incumbents in assessing the proposed redistricting maps, race was not the predominant factor in their decision to adopt the present plan. Accordingly, we grant summary judgment in favor of the defendants on Count II.

## D. *Constitutionality of Residency Requirement*

The third count of the complaint challenges the one-year district residency requirement of Article IV, § I, ¶ 2, of the New Jersey Constitution which provides:

> No person shall be a member of the Senate who shall not have attained the age of thirty years, and have been a citizen and resident of the State for four years, and of the district for which he shall be elected one year, next before his

**460**

election. No person shall be a member of the General Assembly who shall not have attained the age of twenty-one years and have been a citizen and resident of the State for two years, and of the district for which he shall be elected one year next before his election. No person shall be eligible for membership in the Legislature unless he be entitled to the right of suffrage.

This count relates to the plaintiffs, Dennis E. Gonzalez and Jay R. Schwartz, both of whom wish to run for the General Assembly on November 6, 2001.[14]

Gonzalez explains his residency situation as follows. In January 2001, he moved from Paterson to Clifton. Under the legislative districting in effect at that time, i.e., the districting over the last decade, this move meant that he would not have been eligible for election to the General Assembly in 2001, as Paterson was in District 35 and Clifton was in District 34. Inasmuch as Paterson and Clifton remain in Districts 35 and 34, respectively, adoption of the new redistricting plan does not change his residency problem.

While Schwartz's situation is slightly different from Gonzalez's, in the final analysis it is the same. Schwartz explains that in March 2001 he moved from West Paterson to Little Falls. Under the legislative districting in effect at that time, i.e., over the last decade, this move meant that he would not have been eligible for election to the General Assembly in 2001, as West Paterson was in District 35 and Little Falls was in District 34. The redistricting, however, has moved West Paterson to District 34 and Little Falls to District 40 and thus Schwartz is not eligible for election to the General Assembly in 2001. The redistricting, however, did not make him ineligible

to run. It merely did not cure the problem he caused for himself by moving as the redistricting might have done if it had placed West Paterson and Little Falls in the same district.

Significantly, both Gonzalez and Schwartz moved before April 11, 2001, the day that the Apportionment Commission certified the new districts. Thus, they should have recognized that they were certain to become ineligible to run for the General Assembly unless the Commission placed their old and new residences in the same district.

We have set forth the residential background of Gonzalez and Schwartz to demonstrate the lack of relationship of their claim based on their ineligibility to run for the General Assembly to the redistricting claims the plaintiffs advance in the first two counts of the complaint. We have been convened as a three-judge district court under 28 U.S.C. § 2284 which provides for such a court when "an action is filed challenging the constitutionality of the apportionment ... of any statewide legislative body...." In this case, it is clear beyond doubt that the first two counts of the complaint are within section 2284, but the third count standing alone is not.

■ The question, then, is whether a properly convened three-judge court can, and if so should, exercise jurisdiction over all aspects of a case including those that otherwise a single judge would entertain. In *Morse v. Oliver North for U.S. Senate Committee, Inc.,* 853 F.Supp. 212, 215 (W.D.Va.1994), *rev'd on other grounds,* 517 U.S. 186, 116 S.Ct. 1186, 134 L.Ed.2d 347 (1996), the three-judge district court dealing with this issue explained as follows:

---

**14.** Plaintiffs Robertson and Zecker are incumbent legislators in District 34 but they do not assert that the New Jersey residency require- ments preclude them from running for reelection.

We are aware that some three-judge district courts have taken the view that when a three-judge court has been properly convened for some claims in which such a court is required it may, in its discretion, exercise jurisdiction over other claims for which a three-judge court is not required. *See, e.g. Armour v. Ohio*, 775 F.Supp. 1044, 1048 (N.D.Ohio 1991); *Tucker v. Montgomery Bd. of Comm'rs*, 410 F.Supp. 494, 500 (M.D.Ala.1976). However, the only district court decision in that circuit to address the question holds to the contrary and is the more persuasive, we think. We thus follow the three-judge panel of the United States District Court for the District of South Carolina which held, 'Any rights asserted by the plaintiffs under other federal statutes or Constitutional provisions can be asserted only before the [single-judge] District Court.' *Gordon v. Executive Comm. of the Democratic Party of Charleston*, 335 F.Supp. 166, 170 (D.S.C.1971) (per curiam). We think the view of that court is consistent with the intent of Congress to limit the jurisdiction of three-judge courts, which resulted in the 1976 legislation repealing 28 U.S.C. §§ 2281 & 2282 and amending 28 U.S.C. § 2284. See Act of August 12, 1976, Pub.L. No. 94–381, 90 Stat. 1119 (1976); [Charles A. Wright, The Law of Federal Courts § 50, at 296–97 (4th ed.1983) ]; *see also Perez v. Ledesma*, 401 U.S. 82, 87, 91 S.Ct. 674, 678, 27 L.Ed.2d 701 (1971) ('Even where a three-judge court is properly convened to consider one controversy between two parties, the parties are not necessarily entitled to a three-judge court and a direct appeal on other controversies that may exist between them.' (footnote omitted)).

In *Page v. Bartels*, 248 F.3d 175, the court of appeals dealt with the similar but yet different question under section 2284 of whether a three-judge court should entertain a Voting Rights Act challenge to a statewide redistricting plan when the plaintiffs also make a constitutional challenge to the plan. After noting that section 2284(a) provides for a three-judge court when the "constitutionality of" the apportionment is challenged the court of appeals indicated that:

We conclude that because statutory Voting Rights Act challenges to statewide legislative apportionment are generally *inextricably intertwined* with constitutional challenges to such apportionment, those claims should be considered a single 'action' within the meaning of § 2284(a). Thus, when a single district judge is presented with both types of claims, he or she may not resolve the Voting Rights Act issues in isolation while reserving the constitutional claims to a three-judge district court; rather, the single district judge should adhere to the limitations on his authority imposed by § 2284(b)(3).

*Id.* at 190 (emphasis added).

If the standard for us to follow is that we should entertain the residency challenge only if we find it "inextricably intertwined" with the constitutional challenges, then surely the residency issues would not be appropriate for three-judge resolution, as plaintiffs' redistricting and residency challenges are distinct. We are in a different position from that of the court of appeals in *Page*, however, as we have no need to make a definitive ruling on whether the nonconstitutional issues must be resolved by a single judge because we are satisfied from the authorities the district court cited in *Morse* that even if we could hear the residency requirement issue, we would have the discretion not to do so. We think that it is plain that the redistricting and residency issues are so distinct that the sound exercise of discretion

**462**

should lead us to refer the voting rights issue to a single judge for disposition. Thus, we do exactly that and as a three-judge court will not adjudicate the residency issue.

## IV. CONCLUSION

For the foregoing reasons, we grant the defendants' motion for summary judgment on Counts One and Two of the complaint and refer Count Three to a single judge for disposition.